# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 69812-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN STEWART CLARDY, JR. | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 21, 2014 |
| | ) | |

LAU, J. — Kevin Clardy challenges his convictions for first degree robbery, first degree burglary, first degree assault, first degree unlawful possession of a firearm, and drive-by shooting. He contends the prosecutor committed misconduct in closing remarks and also contends the jury instructions erroneously defined the term "reckless or acts recklessly." He raises additional issues in his pro se statement of additional grounds (SAG). Finding no error, we affirm.

## FACTS

The State initially charged Kevin Clardy with first degree robbery, first degree burglary, and first degree assault, all of which the State alleged were committed while armed with a firearm. Codefendants Tia Lyn Eaton, Amani Catrice Sorrell, Josiah M.

Rashid, and Doresida C. Castro were charged in the same information.[1] The State later filed a third amended information charging Clardy with first degree robbery (count I), first degree burglary (count II), first degree assault (count III), first degree unlawful possession of a firearm (count IV), and drive-by shooting (count V). The State alleged Clardy committed the crimes in counts I, II, and III while armed with a firearm.

The parties agree on the background substantive facts. See Resp't's Br. at 3. The charges arose from the robbery of Anthony Dao and Danielle Wright in early March 2011. Both Dao and Wright were home at the time, as were Dao's 7-year old son, BD, and the couple's infant daughter, MD. According to Dao, a woman rang his doorbell late in the evening on March 8, 2011. The woman claimed she was BD's aunt and that she was there to pick up BD for his mother, who was Dao's former girl friend. She insisted that Dao open the door. Dao told the woman to come back the next day, but at her insistence, he eventually opened the front door but kept the storm door closed and locked. Upon opening the front door, he saw a black man with a shotgun outside. The man immediately attempted to break into Dao's home. Dao closed the door and yelled for Wright, who was upstairs, to call the police.

Dao then saw the man and woman run around to the back of his home and shove the barrel of the gun through a back window. Dao ran out his front door to his neighbors' house to ask them to call 911. As he was leaving, he heard more glass breaking, which turned out to be a sliding glass door at the back of the house.

---

[1] Before trial, Clardy's four codefendants entered guilty pleas to various charges for their roles in the events surrounding the robbery. None of the codefendants testified at Clardy's trial.

After alerting his neighbors, Dao returned to his home and entered the front door. He found no one inside, but he could see three or four people running away from the back of the house. He grabbed a large knife and chased them on foot. The robbers ran through Dao's backyard and into an adjacent neighborhood. They taunted Dao as they ran away and fired the shotgun at him once.

Dao abandoned his foot chase and pursued the robbers in his minivan. He drove around the surrounding area and stopped next to a red sedan at a stoplight. He saw four people in the car—two men in the back seat and two women in the front seats. According to Dao, one of the women was the one he first encountered at his front door and one of the men was the one with the shotgun at his house. When the light turned green, the red car sped away and Dao followed. The man with the shotgun fired at Dao three or four times as they drove along, and Dao could hear shotgun pellets hitting his minivan. Dao also claimed that at one point the red car stopped and the man with the shotgun stepped out of the car and fired at him two or three times from a distance of 30 to 60 feet. The man then picked up the spent shotgun pellets and returned to the red car, which sped away again. Dao kept following in his minivan.

About 10 or 15 minutes into the chase, Dao saw a law enforcement officer engaged in an unrelated traffic stop. Dao pulled up to the officer and told him he had just been robbed and needed assistance. He then sped off again in pursuit of the red car. About 5 to 10 minutes later he saw items taken from his home strewn on the roadway. He then saw the unoccupied red car, which had crashed into a guardrail. An officer arrived at the scene and directed Dao to park his car and wait for assistance.

Wright recalled that when she heard Dao open the door late on March 8, she saw a woman outside. She heard a sudden bang on the front door and then heard Dao yell, "Run, babe. They got guns." RP (Nov. 8, 2012) at 471. Wright immediately ran to the master bedroom, retrieved MD and a cell phone, and went to DB's bedroom. As she passed the stairs on the way to BD's bedroom she saw at least two black men, one larger than the other, and possibly another person coming up the stairs toward her. One of the men had a gun. Wright ducked into BD's room, put MD on the floor, and lay on top of MD to protect her.

Wright recalled that at least two of the robbers entered BD's room. One started hitting her hard in the back with what she thought was a large gun, and another held a gun to her head, demanded money, and threatened to kill her. Wright also heard someone rummaging through the rest of the house. After 30 or 40 seconds, the robbers left Wright and went to the master bedroom. Moments later, Wright saw the two men and a woman run downstairs with one of the men carrying Dao's briefcase. Wright heard the robbers leave the house through the back door.

Early in the morning on March 9, police arrested five suspects in an abandoned quarry near where the red car had crashed. The suspects were two black men, including Clardy, and three women. Police recovered two guns—a shotgun and a handgun—in the underbrush near the crash site. In the red car, they found both live and spent shotgun shells, a handgun case, and a rifle case. Strewn on the roadway near the crash site were a broken briefcase and various papers and documents, some of them bearing Dao's name. None of the male DNA (deoxyribonucleic acid) recovered

-4-

from the handgun, shotgun, and shotgun shells was conclusively linked to any of the suspects. No fingerprint evidence was presented at trial.

Dao identified Clardy for the first time at trial as the man he thought was wielding the shotgun during the robbery. Dao admitted he only got a glimpse of the man at his front door and further acknowledged that the man he saw with the shotgun in the back of the red car was "possibly" the same man he had seen at his front door. RP (Oct. 31, 2012) at 334. He eventually acknowledged he was "not sure" it was Clardy in the back seat of the red car when they were stopped at the stoplight. RP (Oct. 31, 2012) at 403. Like Dao, Wright claimed at trial that Clardy was the man with the shotgun.[2]

During closing argument, the prosecutor discussed the "to convict" instructions and explained that they described the elements of each charged crime. The prosecutor continued:

> To put it in less legal terms, it gives you a set, a list, a checklist of things you need to consider and make a decision on. If you decide all of them one way, the Defendant's guilty; if you decide all of them another way, he's not guilty; if you can't decide or you reach different conclusions on different elements, then you can't render a verdict.

RP (Nov. 20, 2012) at 1200. Defense counsel objected, claiming this was a misstatement of the law. The court replied, "Excuse me a moment. Overruled." RP (Nov. 20, 2012) at 1200.

During the defense's closing remarks, defense counsel did not contest that Dao and Wright were victims of a violent robbery, but argued that the State failed to prove Clardy was involved, noting that no one identified Clardy as one of the robbers prior to

---

[2] There was conflicting testimony at trial regarding whether Wright positively identified Clardy as one of the robbers during a show-up identification of the suspects arrested near the crash site.

trial. Defense counsel emphasized, "This trial has not really been about what happened, but about who did it, identification." RP (Nov. 20, 2012) at 1231. Counsel also noted the lack of physical evidence linking Clardy to the crimes and further argued that even if the jurors concluded the State proved Clardy was involved, it failed to prove intent for the first degree assault charge.

The jury convicted Clardy as charged on all counts, including the firearm enhancements for counts I, II, and III. The court sentenced him within the standard range. Clardy appeals.

## ANALYSIS

### Prosecutorial Misconduct

Clardy argues that the prosecutor's statement, quoted above, constitutes prosecutorial misconduct. He contends,

> By arguing the jury had to conclude the State failed to prove beyond a reasonable doubt all of the element[s] listed in the to convict instructions in order to enter a 'not guilty' verdict, the prosecutor set up an impossible hurdle for the defense to overcome to obtain an acquittal on any charge.

Appellant's Br. at 13. The State responds that although "the prosecutor made a confusing statement in closing argument that could be read as a misstatement of the law," Clardy fails to prove prejudicial misconduct where the prosecutor correctly stated the law moments later and the jury instructions correctly advised the jury of the applicable law. Resp't's Br. at 1.

Prosecutorial misconduct requires a showing that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003). "Prejudice is

established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict." State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995). We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). During closing argument, a prosecutor is afforded wide latitude in drawing and expressing reasonable inferences from the evidence, including commenting on the credibility of witnesses and arguing inferences about credibility based on evidence in the record. State v. Millante, 80 Wn. App. 237, 250, 908 P.2d 374 (1995).

Misstating the law is improper and has the potential to mislead the jury. State v. Davenport, 100 Wn.2d 757, 763, 675 P.2d 1213 (1984). However, even if the prosecutor misstated the law or otherwise caused confusion, Clardy is not entitled to a new trial unless he can demonstrate a substantial likelihood that the prosecutor's statements affected the jury's verdict. Pirtle, 127 Wn.2d at 672.

The prosecutor's closing argument as a whole makes clear that he did not intend to argue to the jury that it had to find a failure of proof on every element in order to acquit Clardy. Despite the confusing statement quoted above, the prosecutor correctly stated the law immediately after the statement. The prosecutor turned to the first degree burglary charge and properly discussed the elements of that crime, noting that the only element truly in dispute was identity. He repeatedly emphasized that the State had the burden to prove every element of the crime beyond a reasonable doubt. See RP (Nov. 20, 2012) at 1202-04. The prosecutor argued that the case involved the perpetrator's identity, not what happened—an argument Clardy repeated in his closing

-7-

argument; RP (Nov. 20, 2012) at 1201-10 (prosecutor argued that identity was the disputed element in all of the crimes); RP (Nov. 20, 2012) at 1231 (defense counsel argued, "This trial has not really been about what happened, but about who did it, identification.").

Similarly, the prosecutor narrowed the areas of dispute regarding robbery, assault, drive-by shooting, and unlawful possession of a firearm. The prosecutor's statements properly clarified for the jury that if it found that the State's proof failed on any single element—most likely identity in this case—it should acquit. Defense counsel's closing remarks emphasized the State's burden of proof and argued the State failed to prove the identity and intent elements of the crimes.

Further, the jury instructions cured any potential confusion. See State v. McKenzie, 157 Wn.2d 44, 57 & n.3, 134 P.3d 221 (2006) (proper jury instructions can cure potential prejudice). Each to-convict instruction correctly states that if the jury has a reasonable doubt as to any single element, it must acquit on that charge. For example, the first degree robbery instruction described the six elements of the crime and informed the jury, "[I]f, after weighing all the evidence, you have a reasonable doubt as to any one of the elements (1), (2), (3), (4), (5), or (6), then it will be your duty to return a verdict of not guilty . . . ." (Emphasis added.) Regarding first degree burglary, the jury was instructed, "[I]f, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty . . . ." (Emphasis added.) The first degree assault, first degree unlawful possession of a firearm, and drive-by shooting to-convict instructions contained similar language. The court also instructed the jury that the lawyers' remarks are not evidence

-8-

and that the law is contained in the jury instructions. The jurors were instructed to disregard any remark, statement, or argument that was not supported by the evidence or the law as given to them by the court. We presume that the jury follows the court's instructions. State v. Swan, 114 Wn.2d 613, 662, 790 P.2d 610 (1990).

Because (1) the prosecutor immediately stated the correct law and clarified the State's burden of proof, (2) defense counsel rebutted or clarified the prosecutor's statement in his own closing remarks, and (3) proper jury instructions cured any confusion, we conclude no substantial likelihood any misstatement affected the jury's verdict. Clardy fails to establish prosecutorial misconduct.

<u>Jury Instructions</u>

Clardy contends that his drive-by shooting conviction must be reversed because the trial court erroneously defined "reckless" in its jury instructions. The State responds that Clardy invited any alleged error.

A person is guilty of drive-by shooting if "he or she recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is . . . from a motor vehicle . . . ." RCW 9A.36.045(1). Before trial, the State filed proposed jury instructions, including a definition of recklessness drawn from Washington's criminal pattern jury instructions. WPIC 10.03. The State also filed a pretrial motion to compel Clardy to file "a complete set of proposed instructions." The trial court granted the motion. Clardy then sought leave to agree with the State's instructions, thus avoiding the need to file his own proposed instructions. Clardy specifically requested, "The Defense asks leave not to propose the standard WPIC instructions and instead will rely on the State's proposed

standard instructions. The Defense will propose any supplemental instructions if the need arises." The trial court granted this motion. RP (Oct. 24, 2012) at 251 ("Motion to allow the Defense to agree with the standard WPIC instructions. That's granted.").

The first page of Clardy's proposed instructions states, "The Defense agrees and stipulates to the WPIC standard instructions proposed by the State of Washington except for the additional instructions that are being requested by the Defense." Clardy proposed no additional or different instructions on the definition of recklessness or the drive-by shooting charge. When Clardy revised his proposed instructions during trial, he again explicitly adopted the State's proposed instructions.

The trial court's to-convict instruction for drive-by shooting provided in relevant part:

> To convict the defendant of the crime of Drive-by shooting as charged in count V, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That during the period of time intervening between March 8, 2011, through March 9, 2011, the defendant recklessly discharged a firearm;
> (2) That the discharge created a substantial risk of death or serious physical injury to another person;
> (3) That the discharge was either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge; and
> (4) That the acts occurred in the State of Washington.

The court instructed the jury regarding recklessness in the same language proposed by the State and stipulated to by Clardy:

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that <u>a wrongful act or result</u> may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.
> When recklessness as to a particular fact or result is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly as to that fact or result.

(Emphasis added.)

Clardy assigns no error to the court's to convict instruction but contends the above underlined portion of the court's definition of "reckless or acts recklessly" misstates the law. He argues, "A jury instruction defining the recklessness requirement must account for the specific risk contemplated under that statute," and, thus, the instruction should have replaced the term "a wrongful act or result" with "death or serious physical injury to another person." Appellant's Br. at 17, 18.

Jury instructions are sufficient when they allow trial counsel to argue their respective theories of the case, are not misleading, and when read as a whole, properly inform jurors of the applicable law. State v. Killingsworth, 166 Wn. App. 283, 288, 269 P.3d 1064 (2012). Each instruction is considered in the context of the "instructions as a whole" rather than in isolation. State v. Benn, 120 Wn.2d 631, 654-55, 845 P.2d 289 (1993).

We conclude that under the doctrine of invited error, Clardy may not challenge jury instructions he proposed. The invited error doctrine "prohibits a party from 'setting up error in the trial court and then complaining of it on appeal.'" State v. Armstrong, 69 Wn. App. 430, 434, 848 P.2d 1322 (1993) (quoting State v. Young, 63 Wn. App. 324, 330, 818 P .2d 1375 (1991)). Under the invited error doctrine, "even where constitutional rights are involved, we are precluded from reviewing jury instructions when the defendant has proposed an instruction or agreed to its wording." State v. Winings, 126 Wn. App. 75, 89, 107 P.3d 141 (2005) (emphasis added). Here, Clardy

expressed affirmative agreement to the instructions by joining in the State's proposed instructions. He cannot challenge the jury instruction quoted above.[3]

Statement of Additional Grounds (SAG)

Clardy raises several additional arguments in his pro se SAG. First, he contends, "The statements [and] testimony given by Anthony Dao [and] Danielle Wright were not fact, so they can only be false" and claims the prosecutor committed misconduct by knowingly presenting this allegedly perjured testimony. SAG at 10. He points to several inconsistent or inconclusive statements made by each witness. Our review of the record establishes that at best, Dao and Wright did not have a perfect recollection of the events surrounding the robbery. While their testimony was at times confusing and somewhat contradictory, the fact that some of a witness's statements were inconsistent or that one witness's testimony contradicts another witness's testimony does not reflect misconduct by the witnesses. The evidence does not show that Dao or Wright testified falsely or committed perjury. See RCW 9A.72.050 (perjury consists of person making inconsistent material statements under oath, knowing one to be false). We defer to the fact finder's credibility determinations on issues of conflicting

---

[3] We also note that in addition to inviting the error, Clardy waived this issue by failing to object to the instruction at trial. Under RAP 2.5(a), we may refuse to hear any claim of error not raised in the trial court unless that error constitutes manifest constitutional error. Here, Clardy argues in a footnote and without elaboration that he may raise the issue for the first time on appeal because it involves manifest constitutional error. This is insufficient to justify review. See Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (declining to consider an inadequately briefed argument); State v. Johnson, 69 Wn. App. 189, 194 n. 4, 847 P.2d 960 (1993) ("[P]lacing an argument . . . in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal.").

testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Raleigh, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010). Because the jury had a full opportunity to consider each witness's testimony, we do not disturb its credibility determinations. Clardy fails to show misconduct by either the witnesses or the prosecutor in presenting the testimony.[4]

Clardy also contends the trial court erred in applying firearm enhancements in sentencing him for first degree assault, first degree burglary, and first degree robbery.[5] He claims, "Enhancements apply to all felonies except where the use of a firearm is an element of the offense." SAG at 11. We disagree. In State v. Williams-Walker, 167 Wn.2d 889, 225 P.3d 913 (2010), our Supreme Court considered whether the trial court properly added firearm enhancements in sentencing the defendants for first degree assault, first degree robbery, and first degree murder. For each defendant, the jury returned a special verdict form indicating it found the defendant was armed with a "deadly weapon" at the time of the crime. Williams-Walker, 167 Wn.2d at 893-94. The verdict forms did not mention "firearm," and the trial court relied on the underlying guilty verdicts in imposing a firearm enhancement rather than a deadly weapon enhancement. Williams-Walker, 167 Wn.2d at 899-900. Our Supreme Court held that the jury in each case authorized only a deadly weapon enhancement, not the more severe firearm enhancement. Williams-Walker, 167 Wn.2d at 898. The court did not hold that firearm

---

[4] Clardy also fails to demonstrate prejudice given defense counsel's extensive cross-examination and impeachment of both Dao and Wright.

[5] To the extent Clardy also argues the court improperly imposed a firearm enhancement in sentencing him for his drive-by shooting conviction, the record indicates the trial court imposed no enhancement on that conviction.

-13-

enhancements were inappropriate for crimes in which use of a firearm is an element of the offense. It merely held that a firearm enhancement must be alleged and authorized by the jury in the form of a special verdict:

> For purposes of sentence enhancement, the sentencing court is bound by special verdict findings, regardless of the findings implicit in the underlying guilty verdict. Where a firearm is used in the commission of a crime, the only way to determine which enhancement is authorized is to look at the jury's special findings. A sentence enhancement must not only be alleged, it also must be authorized by the jury in the form of a special verdict.

Williams-Walker, 167 Wn.2d at 900. Here, the jury found by special verdict that Clardy was "armed with a firearm" at the time he committed first degree assault, first degree burglary, and first degree robbery. CP 263-65, 297. The trial court properly imposed the firearm enhancements.

Clardy also contends that his first degree assault and drive-by shooting convictions constitute double jeopardy. Both the United States and Washington State Constitutions protect persons from being twice put in jeopardy for the same offense. State v. Turner, 169 Wn.2d 448, 454, 238 P.3d 461 (2010); U.S. CONST. AMEND. V; CONST. ART. I, § 9. This includes "being (1) prosecuted a second time for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, and (3) punished multiple times for the same offense." State v. Linton, 156 Wn.2d 777, 783, 132 P.3d 127 (2006) (citing State v. Graham, 153 Wn.2d 400, 404, 103 P.3d 1238 (2005)). However, the State may bring multiple charges arising from the same criminal conduct in a single proceeding without offending double jeopardy. State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005). Our Supreme Court has consistently rejected the notion that "offenses committed during a 'single transaction'

-14-

are necessarily the 'same offense'" for purposes of double jeopardy. State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983). Because double jeopardy is a question of law, our review is de novo. Freeman, 153 Wn.2d at 770.

Our courts employ a three-part framework for double jeopardy analysis. Freeman, 153 Wn.2d at 771-73. First, if there is clear express or implicit legislative intent to punish the crimes separately, then we look no further. Freeman, 153 Wn.2d at 771-72. If the legislative intent is unclear, we turn to the "same evidence" test which asks if the crimes are the same in law and in fact.[6] State v. Calle, 125 Wn.2d 769, 777-78, 888 P.2d 155 (1995). Third, if applicable, the merger doctrine may help determine legislative intent. Vladovic, 99 Wn.2d at 419. Even if the two offenses appear to be the same, when each one has an independent purpose or effect, then the two offenses may be punished separately. Freeman, 153 Wn.2d at 773.

Clardy asserts that the offenses of first degree assault and drive-by shooting are "covered under the same statu[t]e." SAG at 16. We presume he argues the offenses are legally identical. We evaluate the two crimes under the same evidence test, which considers "whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). "If each crime contains an element that the other does not, we presume that the crimes are not the same offense for double jeopardy purposes." Freeman, 153 Wn.2d at 772. Offenses are not the same in fact and law if there is an element in each offense that is

---

[6] Washington's "same evidence" test is sometimes referred to as the "same elements" test or "the Blockburger test." Freeman, 153 Wn.2d at 772 (citing Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)).

not included in the other and proof of one offense would not necessarily also prove the other. Calle, 125 Wn.2d at 777; Vladovic, 99 Wn.2d at 423. We view the elements "as charged and proved," not in the abstract. Freeman, 153 Wn.2d at 777.

As charged in this case, drive-by shooting and first degree assault each contain a statutory element that is absent from the others. See RCW 9A.36.011 ("A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death."); RCW 9A.36.045(1) ("A person is guilty of drive-by shooting when he or she recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle . . . .").

However, comparison of the statutory elements at an abstract level does not end the analysis. In re Pers. Restraint of Orange, 152 Wn.2d 795, 818, 100 P.3d 291 (2004); State v. Nysta, 168 Wn. App. 30, 46-47, 275 P.3d 1162 (2012), review denied, 177 Wn.2d 1008 (2013). We must look at the statutory elements and the facts used to prove those elements to determine whether each offense required "proof of a fact which the other d[id] not." Blockburger, 284 U.S. at 304. As the offenses were charged and proved in this case, evidence that Clardy fired a gun was required to prove both his convictions for drive-by shooting and first degree assault. But each offense also required proof of a fact that the other did not. With respect to first degree assault, the State was required to prove that Clardy's shooting was directed at Dao with the intent to inflict great bodily harm. To prove drive-by shooting, the State was required to prove

-16-

that Clardy discharged a weapon from a vehicle or in proximity to a vehicle in a manner that created a substantial risk of death or serious injury to another person.

This is not a case where evidence of a single act was required to prove multiple offenses and was the sole available evidence to prove those charges. The evidence that Clardy fired one bullet at Dao was all that was required to prove first degree assault. This evidence was available, but not required, to support the drive-by shooting conviction. That conviction was also established by evidence that Clardy fired several more times at Dao from the car in which Clardy was a passenger. In sum, first degree assault and drive-by shooting were not the same offenses. It follows that the two convictions did not violate the prohibition against double jeopardy.

Clardy also challenges specific items of evidence admitted at trial. He contests "the presentation of a sweat shirt that was not covered under CrR 4.7 and no one had any record (or) knowledge of how it showed up in the evidence locker." SAG at 19. He argues the sweat shirt evidence was "contaminated" because "[t]here was no control of the contents of the locker." SAG at 24, 25. He also claims "DNA . . . was presented to jurors for no other reason but confusion." SAG at 19. We find no support for these assertions in the record.

Clardy also argues that insufficient evidence supports his convictions. Evidence is sufficient if, when viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficient evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

69812-5-I/18

Circumstantial evidence is as probative as direct evidence. State v. Vermillion, 66 Wn. App. 332, 342, 832 P.2d 95 (1992). Clardy bases his sufficiency challenge on conflicting witness testimony and also claims that identification evidence was unreliable. He essentially contests witness credibility and evidence persuasiveness at trial. We defer to the trier of fact on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. State v. Fiser, 99 Wn. App. 714, 719, 995 P.2d 107 (2000). Given the fact finder's opportunity to assess witness demeanor and credibility, we will not disturb those findings. See State v. Pierce, 134 Wn. App. 763, 774, 142 P.3d 610 (2006). Viewing the evidence in the light most favorable to the State, we conclude a rational jury could have found Clardy guilty of the charged crimes beyond a reasonable doubt.

Finally, Clardy contends the record of proceedings from November 21, 2012 (the in-court presentation of the verdicts) is missing from the appellate record. We received the transcript from these proceedings and reviewed the complete record in deciding this appeal.

## CONCLUSION

We affirm Clardy's convictions.

WE CONCUR:

-18-